UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

WADE M. BASS and                              CIVIL ACTION
JERRI WILSON BASS


VERSUS                                        NO: 09-3339


CHASE HOME FINANCE LLC                        SECTION: R(5))


**ORDER AND REASONS**

Before the Court is defendant's motion on the pleadings, or, in the alternative, motion for summary judgment.[1] Because Louisiana law precludes all actions by debtors against creditors on credit agreements unless the agreement is in writing, and the plaintiffs concede that no such writing exists, the Court GRANTS the motion for summary judgment.


I.    **BACKGROUND**

In June 2006, Wade M. Bass and Jerri Wilson Bass entered into a mortgage loan agreement secured by a property they own at

---

[1]    (R. Doc. 19.)

921 Bald Cypress Drive, Mandeville, Louisiana (Bald Cypress).[2]
Defendant Chase Home Finance LLC (Chase) is the holder of the
note and mortgage on Bald Cypress.[3]

In June 2007, the Basses purchased a second home located at
1815 Neva Court, Mandeville, Louisiana (Neva Court), which the
Basses also mortgaged.[4]  Chase is the holder of the mortgage on
that property as well.[5]

According to Wade Bass's affidavit, the Basses moved into
Neva Court and attempted to sell Bald Cypress in the summer of
2007.[6]  When Bald Cypress did not sell and the Basses could no
longer afford to make the two mortgage payments, Bass contacted
Chase to ask for assistance in making "some alternative
arrangement."[7]  Bass asserts that Chase informed him that, in
order to qualify for an altered payment plan, their mortgage
payments must be delinquent by at least 60 days.[8]  Based on that

---

[2]    (R. Doc. 19-1, 19-3; R. Doc. 22-1 at ¶ 5.)

[3]    (R. Doc. 1-2 at ¶ VII.)

[4]    (R. Doc. 1-2 at ¶ VIII; R. Doc. 22-1 at ¶¶ 4, 6-7.)

[5]    (R. Doc. 1-2 at ¶ IX.)

[6]    (R. Doc. 22-1 at ¶ 6.)

[7]    (*Id.* at ¶¶ 10-11.)

[8]    (*Id.* at ¶ 13.)

information, the Basses stopped making their mortgage payments on Bald Cypress.[9]

Bass asserts that Chase later instructed him to attempt a short sale of Bald Cypress,[10] under which the Basses could attempt to sell the home in order to satisfy part or all of their obligation without a foreclosure.  Bass claims that he complied with Chase's instructions regarding the short sale and secured a "very good" offer on Bald Cypress.[11]  Bass further asserts that the putative purchasers understood that there would be a four- to six-week approval process and agreed to wait.[12]

According to Bass, Chase did not respond within the six-week time period despite numerous attempts by the Basses to contact Chase.[13]  He further explains that the Basses' realtor was able to negotiate an extension of time with the putative purchasers, to March 13, 2008, and informed Chase of the extension.[14]  Bass also claims to have informed Chase of the need to complete the short sale on or before March 13, 2008 through numerous calls and

---

[9]   (*Id.* at ¶ 14.)

[10]  (*Id.* at ¶ 23.)

[11]  (*Id.* at ¶¶ 24, 32.)

[12]  (*Id.* at ¶ 27.)

[13]  (*Id.* at ¶¶ 28-30.)

[14]  (*Id.* at ¶ 31.)

facsimile transmissions.[15]  Bass asserts that, "[w]ith days left on the end of the second extension," Chase's senior negotiator informed him that she had not yet submitted the short sale package and offer to the mortgage loan investor for approval.[16]

Bass claims that, after the March 13, 2008 deadline passed, the putative purchasers purchased another property and the Basses received no other offers on Bald Cypress.[17]  On or about August 26, 2008, Chase filed a petition for executory process resulting in issuance of a writ of seizure and sale of Bald Cypress on August 27, 2008.[18]

The Basses filed suit against Chase in Louisiana state court on March 12, 2009, alleging negligence, breach of contract, detrimental reliance, and breach of fiduciary duty.[19]  On April 22, 2009, Chase removed the case to this Court on the basis of diversity jurisdiction.[20]

---

[15]   (*Id.* at ¶¶ 34-36.)

[16]   (*Id.* at ¶¶ 37-38.)

[17]   (*Id.* at ¶¶ 40, 43.)

[18]   (R. Doc. 1-2 at ¶ XXXIII.)

[19]   (R. Doc. 1-2.)

[20]   (R. Doc. 1.)

## II. LEGAL STANDARD

Chase moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment. If a court considers materials outside the pleadings, it will generally exercise its discretion to treat a motion under Rule 12(c) as a motion for summary judgment under Rule 56(c), which requires notice to the nonmovant and an opportunity to respond with evidence. *St. Paul Ins. Co. of Bellaire, Tx. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279 (5th Cir. 1991). Because Chase has submitted materials outside the pleadings with its motion, the Court will treat Chase's motion as one for summary judgment. This will not prejudice the Basses, who have had notice that the Court might treat Chase's motion as one for summary judgment, as demonstrated by the Basses' own opposition titled "Wade M. Bass and Jerri Wilson Bass Memorandum in Opposition to Chase Home Finance LLC's Rule C Motion to Dismiss and, in the Alternative, Rule 56 Motion for Summary Judgment."[21] Further, the Basses have submitted materials outside the pleadings in response to the motion.

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court

---

[21]    (R. Doc. 22.)

must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id*. at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1996) ("Rule 56 'mandates the entry of summary judgment, after adequate time for discover and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

**III. Discussion**

The Louisiana Credit Agreement Statute, La. R.S. 6:1121, *et seq.*, operates as a "statute of frauds" for the credit industry. *EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 469 (5th Cir. 2006) (quoting *King v. Parish Nat'l Bank*, 885 So. 2d 540, 546 (La. 2004)). Its purpose is "to prevent potential borrowers from bringing claims against lenders based on oral agreements." *EPCO*, 467 F.3d at 469 (quoting *Jesco Const. Corp. v. Nationsbank Corp.*, 830 So. 2d 989, 992 (La. 2002)). La. R.S. 6:1122 provides, "A debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." A "creditor" is defined in La. R.S. 6:1121 as "a financial institution or any other type of creditor that extends credit or extends a financial accommodation under a credit agreement with a debtor." A "debtor" is "a person or entity that obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor." La. R.S. 6:1121. A "credit agreement" is "an agreement to lend or forbear repayment of money or goods or to

otherwise extend credit, or make any other financial
accommodation." *Id.*

Furthermore, La. R.S. 6:1123 is explicit that the following
actions "shall not give rise to a claim that a new credit
agreement is created, unless the agreement satisfies the
requirements of [La.] R.S. 6:1122":

> (1) The rendering of financial or other advice by a creditor
> to a debtor.
>
> (2) The consultation by a creditor with a debtor.
>
> (3) The agreement of a creditor to take or not to take
> certain actions, such as entering into a new credit
> agreement, forbearing from exercising remedies under a prior
> credit agreement, or extending installments due under a
> prior credit agreement.

And La. R.S. 6:1124 specifies:

> No financial institution or officer or employee thereof
> shall be deemed or implied to be acting as a fiduciary, or
> have a fiduciary obligation or responsibility to its
> customers or to third parties other than shareholders of the
> institution, unless there is a written agency or trust
> agreement under which the financial institution specifically
> agrees to act and perform in the capacity of a fiduciary.

The terms of the Louisiana Credit Agreement Statute clearly
apply to the facts of this case.  Chase is a "creditor," the
Basses are "debtors," and any offer to modify the mortgage loan
on Bald Cypress through a short sale falls under the definition
of "credit agreement" as a type of "any other financial
accommodation."  La. R.S. 6:1121.  The Basses do not contend that
Chase's representations were committed to a writing signed by

both parties, or that Chase agreed in writing to act or perform in the capacity of a fiduciary.  Moreover, in response to interrogatories from Chase, the Basses conceded that Chase has never entered into a written agreement with the Basses to modify the mortgage loan on Bald Cypress.[22]  Section 6:1122 thus precludes the Basses from maintaining any "action" against Chase.

The Louisiana Supreme Court has interpreted the term "action" in La. R.S. 6:1122 broadly.  In *Jesco Construction Corp. v. Nationsbank Corp.*, 830 So. 2d 989 (La. 2002), Jesco sought a loan from the defendant bank in order to purchase the stock of another company. *Id.* at 990.  Although the bank told Jesco that the loan was a "done deal," the loan did not go through because of a dispute over the value of the stock. *Id.* at 991.  Jesco then sued the bank in state court, alleging breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty. *Id.*  After the case was removed to federal court and appealed, the United States Court of Appeals for the Fifth Circuit certified the question of whether the Louisiana Credit Agreement Statute "precludes all actions for damages arising from oral credit agreements, regardless of the theory of recovery" to the Louisiana Supreme Court. *Id.*  Answering in the affirmative, the

---

[22]    (R. Doc. 19-2.)

court explained that the term "action" is any "demand for the enforcement of a legal right." *Id.* at 991-92 (quoting *James v. Formosa Plastics Corp. of La.*, 813 So. 2d 335, 338 (La. 2002)).

The Louisiana Supreme Court addressed the breadth of the Louisiana Credit Agreement Statute again in *King v. Parish National Bank*, 885 So. 2d 540 (La. 2004). The plaintiff, King, consolidated several loans, which were secured by mortgages, with the defendant bank. *Id.* at 542-43. Although the note was payable on demand, the bank orally assured King in the course of the loan renegotiation that the consolidation and restructuring would not jeopardize King's financial or personal welfare so long as he remained current on all of his obligations with the bank. *Id.* at 543. Near the maturity date of one of King's loans, the bank informed him that it would require appraisals of his property. Those appraisals indicated that King's property afforded insufficient collateral for the consolidated loan, and the bank refused to renew the loan on its current terms and security. *Id.* In order to avoid foreclosure and bankruptcy, King agreed to give the bank certain properties and a note secured by a collateral mortgage. *Id.* King then filed suit, alleging several tort claims, breach of quasi-contractual obligations, error, fraud, and duress based on the bank's oral assurance that the consolidation would not jeopardize his welfare. *Id.* at 543-44.

Rejecting King's claim that the Louisiana Credit Agreement Statute does not apply to obligations made during the course of loan renegotiation, the court explained that, under La. R.S. 6:1121, "a credit agreement includes an agreement to make *any financial accommodation.*"  *Id.* at 548 (emphasis added).  Because the bank's alleged obligation was not in writing, it was not enforceable.  *Id.*

The Basses argue that, in passing the credit agreement statute, the Louisiana legislature did not intend to bar all claims against banks.[23]  This argument does not demonstrate why the statute does not apply to their claim.  In making their argument, the Basses rely exclusively on *BizCapital Business & Industrial Development Corp. v. Union Planters Corp.*, 884 So. 2d 623 (La. Ct. App. 2004), *writ denied*, 889 So. 2d 267 (La. 2005), which has no factual resemblance to this case.  *BizCapital* involved a financial institution suing third-party banks for negligent misrepresentation and detrimental reliance as a result of statements made about the financial status of a debtor.  The financial institution, BizCapital, alleged that Union Planters and Business Bank misrepresented to BizCapital the reason they sought to have the debtor pay off a loan and failed to tell BizCapital about a $4 million overdraft and the suspiciously high volume of monetary transactions occurring in the debtor's

---

[23]    (R. Doc. 22.)

11

account.  *Id.* at 624-25; *see also id.* at 627-28 (Cannizzaro, J.,
concurring).  BizCapital also alleged that Business Bank's
officer had misrepresented that the debtor had collected on a
$2.9 million account receivable.  *Id.* at 628.  Relying on La.
R.S. 6:1124, which requires a written agreement to create a
fiduciary duty, the trial court granted an exception of no cause
of action filed by Union Planters and Business Bank.  *Id.* at 624.

The Louisiana Court of Appeal for the Fourth Circuit
reversed.  The court concluded that the Louisiana legislature
"did not intend to totally immunize banks from all legal duties
in their relationship with customers and third parties" when it
passed La. R.S. 6:1124.  *Id.* at 626-27.  Rather, the statute was
designed to clarify that a bank has no implied fiduciary duty to
its customers absent a written agreement to that effect.  *Id.* at
627 (citing legislative history).  The court found that La. R.S.
6:1124 did not apply in the context before it, *i.e.*, where one
lender brought negligent misrepresentation and detrimental
reliance claims against another lender.

*BizCapital* obviously has no application here.  As noted,
*BizCapital* involved a financial institution's misrepresentation
to another financial institution regarding a debtor's solvency,
unlike the Basses' claims, which involve a debtor suing a bank on
an oral agreement to modify a loan.  Any offer to modify the Bald
Cypress mortgage loan through a short sale squarely falls under

12

La. R.S. 6:1123 as an "agreement of a creditor . . . to take [a]
certain action[], such as entering into a new credit agreement."
Such an agreement "shall not give rise to a claim that a new
credit agreement is created, unless the agreement satisfies the
[writing] requirements of [La.] R.S. 6:1122."  La. R.S. 6:1123.

The Louisiana Supreme Court has been clear that the
Louisiana Credit Agreement Statute precludes "all actions"
against a creditor absent an agreement in writing.  *King*, 885 So.
2d at 542; *Jesco*, 830 So. 2d at 992; *see also Fortenberry v.
Hibernia Nat. Bank*, 852 So. 2d 1211, 1228 (La. Ct. App. 2003)
(rejecting plaintiff's argument the statute does not cover
allegations of fraud).  Because the Basses concede that they
never entered into a written agreement with Chase related to the
short sale, and they do not allege that Chase ever agreed in
writing to act and perform in the capacity of a fiduciary, the
Basses cannot maintain an action against Chase under Louisiana
Law.  *See In re Dengel*, 340 F.3d 300, 313 (5th Cir. 2003)
("Because Dengel did not plead that he and his wife signed the
credit agreement . . . Dengel may not maintain an action for the
alleged breach under Louisiana Law."); *Bonvillian v. United
States*, No. Civ. A. 98-3369, 1999 WL 1072539, at *3 (E.D. La.
Nov. 24, 1999) ("The plain language of the Louisiana Credit
Agreement Statute [ ] requires that for a cause of action to be
maintained arising from a credit agreement it must be in

writing."); *Whitney Nat'l Bank v. Stack*, No. Civ. A. 91-1320, 1991 WL 255376, at *2 (E.D. La. Nov. 19, 1991) (holding that an oral agreement to forbear repayment was not enforceable); *see also EPCO*, 467 F.3d at 470-71 (declining to dismiss plaintiff's claim because it had "*not* conceded that its claim is based on an oral representation of Chase or an unsigned agreement" (emphasis added)).

**IV.   CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

New Orleans, Louisiana, this <u>1st</u> day of October, 2010.

_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE